SLT:GMP
F. 2013R01789/OCDETF #NY-NYE-745

**15M962**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

IMAN KOBEISSI,
    also known as "Iman Kobeissu" and
    "Iman Kobeissi-Ghadry,"

        Defendant.

- - - - - - - - - - - - - -X

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN
SUPPORT OF
ARREST WARRANT

(T. 18, U.S.C., §§ 371,
922(a)(1)(A), 922(a)(4),
1956(a)(3)(B), 1956(h) and 3551
et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

    Anthony Maddalone, being duly sworn, deposes and states that he is a Task Force Officer with the Drug Enforcement Administration, duly appointed according to law and acting as such.

## MONEY LAUNDERING CONSPIRACY

    Upon information and belief, in or about and between September 1, 2013 and October 5, 2015, within the Eastern District of New York and elsewhere, the defendant IMAN KOBEISSI did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented to be the proceeds of specified unlawful activity and property used to conduct and facilitate specified unlawful activity, to wit: narcotics trafficking, (a) with the intent to promote the carrying on of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(A),

and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(a)(3)(B), 1956(h) and 3551 et seq.)

## UNLICENSED DEALING IN FIREARMS CONSPIRACY

Upon information and belief, in or about and between October 4, 2014 and September 23, 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IMAN KOBEISSI, together with others, not being a licensed importer, licensed manufacturer or licensed dealer of firearms, did knowingly and willfully conspire to engage in the business of dealing in firearms.

(Title 18, United States Code, Sections 371, 922(a)(1)(A), 922(a)(4) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Task Force Officer with the Drug Enforcement Administration ("DEA") and have been involved in the investigation of numerous cases involving the investigation of narcotics offenses. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for drug trafficking, money laundering and firearms offenses, as well as other offenses. During my tenure with the DEA, I have participated in numerous narcotics and money laundering

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds and records of narcotics and money laundering transactions have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers and money launderers; (d) debriefed cooperating drug traffickers and money launderers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking and money laundering. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.

2. In or about late September 2013, a confidential source with the DEA ("CS1") had a face-to-face meeting with defendant IMAN KOBEISSI for the purpose of discussing money laundering and drug trafficking transactions. During the course of the meeting, KOBEISSI offered CS1 – who posed as an individual who worked with drug traffickers – her services in laundering narcotics proceeds. Specifically, KOBEISSI stated that she had criminal associates in Lebanon who could arrange to launder drug proceeds and who would be interested in purchasing narcotics from CS1's sources of supply.

3. After the September 2013 meeting, KOBEISSI maintained contact with CS1 and introduced him/her to one of her money laundering contacts in the United Kingdom (co-conspirator 1 ("CC1")). On or about August 12, 2014, CS1 met with CC1, another

confidential source ("CS2") and an undercover DEA agent (the "UCA"). CS2 and the UCA represented themselves to be involved in narcotics trafficking and money laundering. During the August 12, 2014 meeting, CS1, CS2 and the UCA discussed the possibility of providing narcotics proceeds to CC1 to launder. Following the meeting, CS1, CS2 and the UCA continued their communication with KOBEISSI and CC1. During the course of those discussions, KOBEISSI and CC1 discussed the details of laundering drug money as well as the distribution of cocaine shipments. Specifically, CC1 requested to purchase kilogram quantities of cocaine from the UCA and CS2.

   4. KOBEISSI maintained contact with the UCA between August 23, 2014 and September 2014, during which they had further discussions about money laundering and cocaine trafficking.

   5. On or about September 24, 2014, an undercover agent gave 30,000 British Pounds (the equivalent of $50,000) to CC1, which were represented to be narcotics proceeds. The purpose of the transaction was for CC1 to launder the drug money and CC1 was provided instructions to transfer the funds to a specific account (i.e., an undercover account located in Brooklyn, New York). After receiving the cash, CC1 arranged to have the funds transferred to the undercover account located in Brooklyn on or about October 3, 2014. CC1 charged the UCA and CS2 20 percent of the funds as a commission for performing the money laundering transaction.

   6. Following the October 4, 2014 transaction, KOBEISSI advised CS1 that she had friends in Hezbollah[2] who were looking to purchase cocaine, weapons and

---

[2] Hezbollah is a Shi'a Islamist militant group and political party based on Lebanon. It is

ammunition from the UCA and CS2. To that end, KOBEISSI requested to introduce the UCA and CS2 to her Hezbollah contacts to finalize the details of the illicit transactions. KOBEISSI advised CS1 that, on or about October 17, 2014, she would be traveling to New York on business. CS1 advised KOBEISSI that he/she would arrange for KOBEISSI to meet with UCA and CS2 while she was in New York for her visit.

7. On or about October 19, 2014, the UCA and CS2 picked up KOBEISSI at the Waldorf Astoria Hotel, in New York City, where she was staying, and drove with her to a location in Brooklyn, New York for a lunch meeting. During this meeting, KOBEISSI discussed with the UCA and CS2 cocaine trafficking, weapons trafficking and money laundering. Specifically, the UCA and CS2 advised KOBEISSI that their main business was moving drugs and laundering drug proceeds. At that point, KOBEISSI stopped the conversation to remove the battery from her cellular telephone. After the conversation resumed, in sum and substance, KOBEISSI discussed her contacts in France who were capable of laundering money through Blom Bank. KOBEISSI offered to introduce the UCA and CS2 to her contacts in France who would be capable of laundering drug money. KOBEISSI further stated that she wanted to introduce the UCA and CS2 to her contacts in the Iranian government who were seeking to obtain weapons and other types of equipment that was difficult to procure (i.e., restricted technology, weapons, weapons parts and military/civilian aircraft parts). KOBEISSI advised that her contacts would like to obtain such weapons and equipment from the UCA and CS2. These meetings were audio and video recorded; portions of those conversations follow below.

---

currently classified by the United States and several other nations as a terrorist organization.

8.  During the October 19, 2014 meeting, KOBEISSI, the UCA and CS2 agreed that they would use the code word "fireworks" to refer to "anything about arms." KOBEISSI asked, "do they have heavy, heavy arms, or?" To which the UCA responded, "Yeah. You know what? He was. I told him exactly what you told me. I said listen, my friend says that whatever you have just tell me and they'll buy it. He actually says look, it doesn't work that way. He says I don't have any in my house piled up so you tell me what you need and I'll . . . ." To which KOBEISSI replied, "They need everything."

9.  Later in the conversation, after the UCA explained his purported connection for firearms, KOBEISSI, the UCA and CS2 engaged in the following exchange:

KOBEISSI:   Look. I'll be very transparent.

UCA:        Please now is the time to [UI]

KOBEISSI:   We are going to sell it for the Iranian.

UCA:        Okay. That's fine.

KOBEISSI:   If you want…I can…If you put for example if you put for example…My people will send an expert guy for this kind of things wherever you want. If you want you can come to Lebanon in the airport. You don't come inside. Inside the airport there are too much, uh, powerful.

***

KOBEISSI:   So they meet you in the airport with the expert to discuss price, quality, specs -- everything. If you want, they can travel to Cyprus. To Emirates. It's good for them you know [UI]. So they can buy any quantity anything, anything, anything [UI] Iran. So one option you can send an airplane full of things you know. They will let you land without knowing anybody. Anybody knowing, you know. They will send you a clearance. They are professionals there.

UCA:        Yeah, I know.

KOBEISSI:   So you can go to Kish Island; you know it's on the frontier of Iran. So, like, it's a free zone.

CS2:        Okay. Yes, yes.

KOBEISSI:   Uh, you have you will get a clearance.  Nobody will know that you are

UCA:   No.  No, we do the same thing with drugs. The same things for drugs.

KOBEISSI:   You put full airplane.  You go land there.  You will take them.  For the first deal they will not give you a deposit.  You know they will not pay a deposit for the first time.  On side they pay, you know.  If you want they can your money from my house.

CS2:   Okay.

KOBEISSI:   You know.  In cash.  And I will tell you what I can do for you in Lebanon later.

***

KOBEISSI:   I will set you down for a meeting, I will first, 'cause they know I am talking about fireworks.

CS2:   Don't talk on the telephone.

KOBEISSI:   No, no, no.  I will talk as if I'm doing business for oil don't worry.  I've very…

UCA:   We do the same thing

CS2:   Very important very important your security's the more important thing.  Business we can always find new business.  But if we lose you then (UI)

KOBEISSI:   No worries.  I will set up for a meeting.  You know I hope you can give me good prices because you know there we can make money.

   10.   Later in the conversation, KOBEISSI, the UCA and CS2 discussed the percentages that would be charged for money laundering transactions.  KOBEISSI also discussed the details of the money laundering transaction that would take place in Paris with her money laundering associate there.

KOBEISSI:   You bring your money the cash. With your hands you know. Or you transfer.

CS2: No, no, we're not going to take it out. We're just going to open an account.

KOBEISSI: For example you transfer straight away and they are ready to move for any quantity one time.

CS2: Alright

UCA: In bulk or transfer?

CS2: Yes, bulk and transfer?

KOBEISSI: Both.

***

KOBEISSI: No Problem, he goes. He opens an account with the foreign uh

CS2: Passport

KOBEISSI: Passport. He transfer, they will give you. You know how to do by [UI] you know what I mean. Very good.

CS2: Venezuela passport.

KOBEISSI: Venezuela.

UCA: Can you open it with a Venezuelan?

KOBEISSI: I told- when, George told me. He said Italian passport. I said Italian passport, but Venezuelan no problem. You can ask no problem.

CS2: Italian, you know I have one but I'd rather use a Venezuelan Passport.

KOBEISSI: No problem. They will open you an account for the future you can bring cash.

11.    During the conversation, KOBEISSI also discussed with the UCA and CS2 the possibility of doing cocaine shipments. Towards the end of the conversation, KOBEISSI discussed the possibility of the UCA and CS2 obtaining spare aircraft parts that they could sell to Iran – specifically, aircraft parts that were not permitted to be sold to Iran

because of sanctions the United States has against Iran. During that portion of the conversation, CS2 stated, "We have three things to work: We do have the merchandise, we call it merchandise. We got the fireworks, and we do have this deal with the bank." In response to this statement, KOBEISSI stated, "And the fourth one the spare parts. Hopefully." KOBEISSI further stated:

>KOBEISSI: They need about fifteen airplanes now.
>
>CS2: They cannot move because they have no planes.
>
>KOBEISSI: Now. Billions it costs. They will pay it no problem.
>
>CS2: We can make money there. We can make some money.
>
>UCA: Probably more money than the Kilos.
>
>KOBEISSI: Too much money. Too much.
>
>CS2: We can make more money than the drugs.
>
>KOBEISSI: Fifty I swear
>
>CS2: We can make more money than the drugs.
>
>KOBEISSI: More money if you have a good connection for spare parts for Iran, without sanctions because if they remove the sanctions, they will work with Boeing no problem.
>
>UCA: Right.
>
>KOBEISSI: Now we have our chance that there is sanctions, we are the only people to give them parts you know. For the two airports. Nobody, nobody can get it.
>
>UCA: Ok.
>
>KOBEISSI: If you get me the clearance, if you give me the clearance to ship. The same thing for the fireworks nobody would know. Because we have to make a turn you know. If it's from Venezuela, United States, Venezuela, Venezuela, there, I would be perfect.

UCA: Ok because the same thing for Colombia, they have all the Jets and cargo planes they are all American. My uncle right now does the paper work. They come in and they ship the parts.

KOBEISSI: They need everything for spare parts. Everything.

12. On October 20, 2014, KOBEISSI met again with the UCA and CS2, this time at a restaurant in New York City. During the October 20, 2014 meeting, KOBEISSI again discussed details relating to money laundering and weapons trafficking. Specifically, in sum and substance, KOBEISSI discussed with CS2 and the UCA additional details about meeting with her lawyer associate, a money launderer, in Paris, France. They agreed that this meeting would take place on or about November 12, 2014. KOBEISSI also agreed to make arrangements for another associate to come to Haiti to discuss possible weapons and narcotics sales. Further, KOBEISSI advised the UCA that the list of aircraft parts that she had provided was a test to see if the UCA and CS2 could deliver. She further requested a price list of weapons that the UCA and CS2 could provide. This meeting was also recorded.

13. Following the October 19 and October 20, 2014 meetings, KOBEISSI continued to communicate with the UCA and CS2 via e-mail, WhatsApp and Skype. Copies of the draft e-mails and WhatsApp chats were maintained and put into evidence, and the Skype calls were recorded. In the course of these communications, KOBEISSI discussed further details about arranging a meeting in Paris, France on November 20, 2015 for the purpose of introducing the UCA and CS2 to one of her money laundering contacts, an attorney ("Co-Conspirator 2" or "CC2"). The meeting in Paris was canceled, however, because CC2 was denied a visa to enter France. On November 17, 2014, KOBEISSI had a Skype call with the UCA and CS2. During that call, KOBEISSI indicated that CC2 was an influential banking

individual, and that he would be with her on the following day so that the UCA and CS2 could speak to him. On November 18, 2014, the UCA and CS2 placed a Skype call to KOBEISSI. During this call, KOBEISSI was present with CC2, and the UCA and CS2 discussed the possibility of meeting CC2 in person in Sofia, Bulgaria around the week of December 8, 2014. CS2 also asked KOBEISSI if her weapons associate would be able to meet in Bulgaria around that same week (i.e., the week of December 8, 2014). KOBEISSI stated, in sum and substance, that she would find out, and wanted to know about the list of weapons that the UCA communicated to her via draft e-mail. The UCA advised KOBEISSI that the serial numbers on the list were important, and that her associates should know what type of weapons they were. Notably, the list that the UCA provided to KOBEISSI listed several types of heavy weaponry, including rocket-propelled grenade launchers. This list was maintained and place into evidence.

14. On or about March 5, 2015, CS2 met with KOBEISSI and CC2 in Paris, France. This meeting was surveilled and photographed by the French Police. The purpose of the meeting was to finalize the delivery of approximately $250,000, in Euros, that was purported to be narcotics proceeds. During that meeting, CS2 informed KOBEISSI and CC2 that his/her associates would be importing a shipment of narcotics into Belgium and, therefore, would have additional narcotics proceeds for KOBEISSI and CC2 to launder. KOBEISSI and CC2 indicated that they would be able to assist CS2's drug trafficking associate. During this meeting KOBEISSI emphasized her associates' influence in Africa – specifically, Ghana, Nigeria and the Congo. KOBEISSI further indicated that she would be capable of arranging a shipment of cocaine from Puerto Rico. KOBEISSI further stated, in sum and substance, that it would be easiest for her and her associates to launder illicit funds through Bulgaria. Near the

conclusion of this meeting, KOBEISSI instructed CS2 as to the code that she would use for the quantity of cash that she wanted the UCA to bring. Specifically, she stated, in sum and substance, that when she called the UCA to arrange the money transfer, she would refer to increments of 10,000 Euros as "bottles." As such, if she said to bring "four bottles," she meant to bring 40,000 Euros for the meeting.

15. On or about March 6, 2015, the UCA met with KOBEISSI at a café located in the vicinity of 190 Haussmann Boulevard in Paris, France. This meeting was also surveilled and photographed by the French Police. At this meeting KOBEISSI informed the UCA that her associate had experienced a delay in dealing with the bank and, therefore, would be unable to facilitate the movement of money as they had expected. KOBEISSI further advised the UCA that the "big boss" would be sending a driver to pick up the money that the UCA was originally meant to give to KOBEISSI on Sunday. KOBEISSI indicated that she would delay her trip to Monday or Tuesday to ensure that the money was wired to the UCA on Monday. KOBEISSI, in sum and substance, went on to explain that it was difficult to launder money in France due to the scrutiny that the French authorities gave monetary transactions and that people could easily be put in jail if they were found to be laundering money. KOBEISSI further asked the UCA about the country to which the UCA wanted the money laundered. The UCA replied that he/she wanted the money wired to the United States, to which KOBEISSI responded, "very good." KOBEISSI further stated, in sum and substance, that the wire would be sent from a very legitimate company. KOBEISSI asked the UCA, in sum and substance, if his/her associates would be able to provide additional bank accounts to which they could wire money if needed by KOBEISSI's associates. The UCA responded that he/she could do so. After further conversation, the UCA handed a bag to KOBEISSI that contained 214,460 Euros

(equivalent to $250,000), at which point KOBEISSI stated, in sum and substance, "my gift." KOBEISSI told the UCA that if their "relationship" continued, she would rent an apartment for a week or so, in a nice area of Paris where business could be conducted without many people watching. KOBEISSI also stated, in sum and substance, that the wire transfer of the money would go out on Monday and she provided the UCA with a French telephone number.

16. On March 9, 2015, KOBEISSI provided documentation to the UCA to demonstrate that she had arranged for the wire transfer of 171, 588 Euros through Mashreq Bank PSC in Dubai. The account holder at this bank was listed as Static Gran International, Limited. The DEA undercover shelf account was listed as the beneficiary of this wire transfer. The amount deposited represented the 214,460 Euros that the UCA had provided to KOBEISSI, less the 20 percent commission that KOBEISSI had previously negotiated with the UCA and CS2. On March 19, 2015, the money was received into a DEA undercover shelf account located in Brooklyn, New York.

17. On or about April 20, 2015, the UCA communicated with KOBEISSI and CC2 via Skype. These calls were recorded. During the first call, KOBEISSI indicated that she was in contact with a new associate who was able to launder money through Cotonou, Benin. KOBEISSI stated, in sum and substance, that her money laundering associate in Benin was associated with a finance company and would be able to wire money anywhere in the world, including the United States and Europe. KOBEISSI indicated that her associate also deals with the sale of thousands of vehicles in Benin and would be able to launder funds for a 15 percent commission rate. CC2 participated in the second call via Skype. During that call, KOBEISSI and CC2 indicated that CC2 would be getting a new telephone to communicate with the UCA. KOBEISSI, CC2, CS2 and the UCA also discussed possible dates for meeting in

France in the future. KOBEISSI and CC2 further advised the UCA and CS2, in sum and substance, that they would be able to receive cash in California, Texas and Florida.

     18. In or about early August 2015, KOBEISSI contacted the UCA. KOBEISSI, in sum and substance, indicated that she had access to banking institutions in Budapest, Hungary, which would be able to assist the UCA and his associate with laundering money.

     19. On or about August 11, 2015, KOBEISSI informed the UCA, in sum and substance, that she had a customer that was interested in buying weapons. KOBEISSI further informed the UCA that she had a list and wanted to know from the UCA how she should send it, in a secure manner. In response, the UCA provided a new e-mail address, IntTradeinc@hotmail.com to KOBEISSI, which KOBEISSI could use for the purpose of sending a list of weapons. On or about August 12, 2015, the UCA received an e-mail from KOBEISSI using e-mail address, miutao1234@gmail.com, that contained a list provided by KOBEISSI, which requested handguns, sniper rifles, automatic assault rifles, among other weapons. The list further included a request for blue prints for "heavy weaponry." The e-mail from KOBEISSI stated:

> [T]he requirements are the following:
>
> -M200: 250 pieces, with 5 magazines for each piece x250, which equals 1000 magazines.
>
> -M4: 500 pieces, with 5 magazines for each piecex500, which equals 2500 magazines.
>
> -OICW: 500 pieces, with 5 magazines for each piecex500, which equals 2500 magazines.
>
> -GLOCK 19: 1000 pieces.
>
> We also need blueprints for heavy weaponry.

> Please, we need to have the prices as fast as we can. When the prices are agreed on, we will discuss terms of payment and delivery area face to face on the first week of september as your uncle said.
>
> Those are for the people we talked about when we were in the US.
>
> Waiting to hear from you very soon.

Based on my knowledge of the investigation, when KOBEISSI referred to "the people we talked about when we were in the US," she is referring to her associates in Iran.

20. After the UCA received this e-mail, the UCA and KOBEISSI agreed to conduct a Skype call for the purpose of clarifying KOBEISSI's associate's weapons request. They further agreed that the UCA's purported weapons associate, a second undercover DEA agent ("UCA2"), would participate in the call. On or about August 17, 2015, the UCA, UCA2, KOBEISSI and an unidentified male ("UM") participated in a Skype call. KOBEISSI called using the Skype account, miutao1234. This call was recorded. During the call, KOBEISSI advised, in sum and substance, that the handguns would be going to Lebanon and that the other weapons systems would be going to Iran. KOBEISSI further indicated that her associate –the UM – was with her and could make all of the decisions. During this conversation, the UM asked for prices for M200 sniper rifles. The UM and KOBEISSI further inquired about prices for M4 carbine automatic rifles[3] and pistols. The UCA, UCA2, UM and KOBEISSI engaged in discussions concerning the transportation of the weapons to the Middle East, Turkey and Iran. Specifically, KOBEISSI and the UM discussed with the UCA and UCA2 the possibility of hiring private aircraft to deliver weapons, or the possibility of using cargo containers. KOBEISSI and the UM emphasized that they needed the weapons to eventually be delivered to

---

[3] An M4 Carbine Rifle is a type of machine gun.

Iran. KOBEISSI further indicated, in sum and substance, that she and UM would be able to get special permission for the UCA and UCA2 to land their plane in Tehran, Iran. In the course of this conversation, KOBEISSI told the UCA, in sum and substance, that she was expecting to meet with the UCA's associate at the beginning of September in Romania to discuss a separate deal, which the UCA understood based on prior conversations to be drug related, and she then asked the UCA whether it would be okay for one of her associates to come to Romania at the same time to negotiate this particular weapons deal. The UCA advised KOBEISSI that he/she thought it was a great idea.

21. On or about August 26, 2015, KOBEISSI sent an e-mail to the UCA containing an additional list of weapons that KOBEISSI's associates sought to obtain. On or about September 1, 2015, the UCA, UCA2 and KOBEISSI had a conversation via Skype during which they discussed the list of weapons that she had recently sent to the UCA. This call was recorded. KOBEISSI also discussed with the UCA and UCA2 a future in-person meeting during which they would meet with KOBEISSI and her associates to negotiate future drugs and weapons deals.

22. A search of federal database records indicates that the defendant IMAN

KOBEISSI does not possess a Federal Firearms License.

WHEREFORE, your deponent respectfully requests that the defendant IMAN KOBEISSI, be dealt with according to law.

Because of the nature and contents of this application, I respectfully request that this Affidavit and the accompanying arrest warrant be filed under seal.

_____
Anthony Maddalone
Task Force Officer
Drug Enforcement Administration

Sworn to before me this
6th day of October, 2015

_____
THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK